Breitel, J.
The issue on summary motion is whether an annual corporate meeting may be annulled and the election of directors and adoption of resolutions set aside where the beneficial owner of 16.7% of the outstanding common stock was deprived of an opportunity to request a proxy and to vote, and other shareholders were incorrectly informed that these shares could not be voted.
The election, it is concluded, was valid. No notice to the beneficial owner, Goldfield, of the meeting was required; and there was no misrepresentation in the proxy materials circulated which, under the circumstances, could have misled a substantial number of other shareholders. Although General Host, the corporation concerned, may have breached a duty it owed as Goldfield’s pledgee, in effect depriving Goldfield of a proxy vote at the shareholders’ meeting, the wrong involved was only an individual wrong, not affecting shareholders at large. Since there was no showing that the results of the election would have been different because of the individual wrong, the election may not be annulled.
Section 619 of the Business Corporation Law, under which the proceeding was brought, provides: “ Upon the petition of any shareholder aggrieved by an election, and upon notice to the persons declared elected thereat, the corporation and such other persons as the court may direct, the supreme court at a special term held within the judicial district where the office of the corporation is located shall forthwith hear the proofs and allegations of the parties, and confirm the election, order a new election, or take such other action as justice may require.” Since only the validity of elections may be challenged by summary proceeding under the statute, the validity of other action taken at the meeting will not be considered (see, for examples of plenary actions to void resolutions adopted at corporate meetings: United Hotels Co. of Amer. v. Mealey, 147 F. 2d 816, 819; *268 Lewis v. Matthews, 161 App. Div. 107, 108; Davison v. Parke, Austin & Lipscomb, Inc., 165 Misc. 32, 33; see, also, 5 Fletcher’s Cyclopedia Corporations [Perm ed.], § 2073, pp. 350-351; 20 Carmody-Wait 2d New York Practice, Actions by and Against Shareholders, § 121:435).
Host, a New York corporation, had 2,610,336 common shares outstanding on July 10, 1970, of which 437,700 were beneficially owned by Goldfield. The Goldfield shares had been pledged to the Union Bank of Los Angeles to secure certain notes. These notes were sold to Host, and on April 8, 1970 Host pursuant to the security agreement transferred the collateral shares into its own name as pledgee. Host now claims, and Goldfield disputes, that by that date Goldfield was in default for failure to pay interest. It is undisputed, however, that Host had given no contemporaneous notice either of the default or the transfer.
Because of the transfer of record, Goldfield did not receive the July 13,1970 notice of the annual meeting to be held August 13, 1970. The proxy materials stated that: “As of July 10, 1970, the Goldfield Corporation (‘ Goldfield ’), New York, N. Y. owned 437,700 shares of Common Stock * * * These shares are pledged to secure notes of Goldfield held by the Company and are subject to an option by the Company to purchase them at market value at any time prior to January 31,1971. In the event that prior to the annual meeting, the option is exercised or a default is called under the notes, the 437,700 shares will then be held by the Company and will not be outstanding for purposes of the annual meeting.” Later, on July 20, 1970, Host sent a notice of default to Goldfield but made no mention of the earlier April 8 transfer of record title. On July 23, 1970 a letter was mailed to shareholders stating that a default had been called, and that Goldfield’s shares could not be voted, again without mention of the April 8 record transfer. On July 28, 1970 Goldfield wrote the transfer agents of Host denying the default, and refusing to authorize a transfer of record title to Host. This letter went unanswered.
Goldfield concededly had: actual notice of the meeting, the proxy materials, and the July 23 letter to shareholders. It made no attempt, however, to communicate with other shareholders, to solicit proxies, or to propose an alternative slate of *269 directors. A resolution of Goldfield authorized its president to vote its -shares against the management nominees, hut did not offer an alternative slate. The resolution also directed its president to vote against management proposals, but again no attempt was made to communicate with other shareholders in advance of the meeting.
Six persons connected with Goldfield, including its president and counsel, attended the meeting. They were refused admission as' representatives of Goldfield, but were allowed to participate as shareholders or proxyholders in their individual capacities. On each issue, except the selection of an accountant, Goldfield’s counsel stated Goldfield’s position contrary to that of management.
At the meeting management held proxies for 1,591,372 shares, or 60% of the total, if Goldfield’s shares are considered outstanding. Bach management nominee for the three director positions received 1,685,627 favorable votes. Under Host’s system of cumulative voting, Goldfield could have cast 1,313,100 votes for one nominee of its own choosing, still not enough to elect a single director.
There are basic rules. First, if Goldfield had been the record owner on July 10, 1970 it would have been entitled to receive notice of the meeting. Although persons connected with Goldfield attended the meeting and presented Goldfield’s views, there was no waiver since these persons were not allowed to participate by voice or vote as Goldfield’s representatives (Business Corporation Law, § 606). Generally, failure to give notice in accord with the statute and the corporate by-laws would have rendered the election void, and, if void, a new election would have been required even without a showing that the results of the election would, or might have been different (Matter of Empire State Supreme Lodge, 118 App. Div. 616; Matter of Keller, 116 App. Div. 58, 60; Matter of Melloh v. Beattie, 17 Misc 2d 902, 903; Matter of M. & O. Realty Corp., 16 Misc 2d 562; Matter of 74 Tremont Ave. Corp., 10 Misc 2d 662, 663; Matter of Janaug, Inc. v. Szlapka, 6 Misc 2d 84, 85; Matter of Green Bus Lines [Turner], 166 Misc. 800, 804; Matter of Maurer, Inc., 77 N. Y. S. 2d 159, 161; E. Aranow & H. Einhorn, Proxy Contests For Corporate Control [2d ed. 1968], pp. 500, 509; Ann., Stock *270 holders’ Meeting — Informality, 51 A. L. R. 941, esp. p. 954; 3 White, New York Corporations, Shareholders, par. 619.04, subd. [1]; 20 Carmody-Wait 2d New York Practice, Action by and Against Corporations, § 121:438; 11 N. Y. Jur., Corporations, §§ 407, 410). But since Goldfield was not the owner of record on the record date, it was not, without more, entitled to notice of the election, and thus, at least on this ground, the election is invulnerable.
In a proper case, it may be that the courts would look beyond record ownership in favor of beneficial ownership to uphold or overturn an election, but this is not such a case (cf. Andrews v. Precision Apparatus, 217 F. Supp. 679, 685-686; Benintendi v. Kenton Hotel, 181 Misc. 897, 899, affd. 268 App. Div. 857, mod. on other grounds 294 N. Y. 112; Aranow & Einhorn, op. cit., supra, pp. 506-508). So, too, on the other side of the problem, an issue not necessary to decide is whether the court in its discretion may abstain from undoing the election where there is an inadvertent or insignificant failure to give proper notice of meeting to holders of very*few shares who have actual, adequate notice. The point is that the statute provides a discretionary alternative for the hearing court, namely, “ to take such other action as justice may require.” In this context it is relevant that a defect in notice of a meeting may be waived before or after the meeting (Business Corporation Law, § 606).
Second, if there had been material misrepresentations to shareholders at large, the election could be overturned. Again, there is no necessity to show that without the misrepresentations a different result would have ensued. Elections, however, will not be overturned for just any misrepresentation. The materiality of the misrepresentation, the completeness of other information from which shareholders could determine the truth, and the likelihood, given the circumstances of the election, that some shareholder might have voted differently as a result of the misrepresentation, without going so far as to show an entirely different result on the tallied vote, should all be considered (see Matter of Hoe & Co., 14 Misc 2d 500, 505, affd. 285 App. Div. 927, affd. 309 N. Y. 719 ; General Time Corp. v. Talley Ind., 403 F. 2d 159, 162, cert. den. 393 U. S. 1026; Matter of Scheuer, 59 N. Y. S. 2d 500, 501; General Inv. Co. v. American Hide &
*271 Leather Co., 97 N. J. Eq. 230, 235; cf. Matter of Doeskin Prods., 7 A D 2d 42, 46; Aranow & Einhorn, op. cit. supra, pp. 503-506, 510; see, generally, 11 N. Y. Jur., Corporations, § 442).
A supplemental letter to shareholders dated July 23, 1970 stated that Goldfield had no right to vote. In fact, even at this date, Goldfield could have compelled Host to grant it a proxy. This representation, if false, was not unimportant. With Goldfield out, the election boiled down to a simple vote of confidence for management; with Goldfield in, shareholders, at least potentially, had a palpable choice.
Nevertheless, the election was valid because other shareholders could not have been misled by the alleged misrepresentation. Thus, it has been said: ‘ ‘ Even assuming there were misstatements or concealments, the election may not be set aside unless the court concludes further that the result would have been different had no such improprieties been injected into the proxy campaign, or that an inequitable result has been thereby produced (Matter of Green Bus Lines [Turner], 166 Misc. 800). Of course, it is not necessary to show that a substantial number of stockholders was actually deceived * * * ; petitioner is entitled to the court’s interposition upon a reasonable showing that they might have been.” (Matter of Hoe & Co., 14 Misc 2d 500, 505, affd. 285 App. Div. 927, affd. 309 N. Y. 719, supra). And, again: ‘ ‘ The test * * * is whether * * * there is a substantial likelihood that the misstatement * * * may have led a stockholder to grant a proxy to the solicitor or to withhold [it] * * * whereas in the absence of this he would have taken a contrary course.” (General Time Corp. v. Talley Ind., 403 F. 2d 159,162, cert. den. 393 U. S. 1026, supra).
Prior to the meeting, Goldfield made no attempt to communicate with other shareholders or to solicit proxies despite the fact that Goldfield urges it always believed that it was entitled to vote as the owner of record. Since Goldfield offered no alternative to management’s slate of directors, other shareholders were not misled to take action they would not have taken otherwise.
At the meeting Goldfield’s views were presented. Goldfield argues that it would have had much more influence had its representatives been permitted to speak in a representative capacity. But, in any event, it would have had little influence, since by then *272 management controlled an overwhelming 60% of the' vote- as a result of proxies obtained in advance. The solicitation of proxies by Host and the abstention from like solicitation by .Goldfield had cast the die irretrievably in favor of management.
It is concluded, therefore, that the election may not be annulled for lack of notice or misrepresentation to shareholders at large. In the usual case that would be the end of the matter, but here Host committed a wrong in its capacity as pledgée when it failed to notify Goldfield of the April 8 record transfer. It is relevant then whether the individual wrong warrants undoing the election.
If Goldfield had had notice of the record transfer it would have been entitled to demand a proxy from Host in Goldfield’s favor. The pledgee of stock held as security must issue a proxy to the pledgor upon demand (Business Corporation Law, § 609, subd. [d]; Matter of Flagg-Utica Corp. v. Baselice, 14 Misc 2d 476, 482; 11 N. Y. Jur., Corporations, § 423). The rule applies even where the pledgee is the issuing corporation. True, treasury shares may not be voted (Business Corporations Law, § 102, subd. [14]; § 612, subd. [b]; comment, The Corporate Fiduciary’s Power to Vote Its Own Stock, 68 Col. L. Rev. 116; 1 Hornstein, Corporation Law and Practice, § 311). Similarly, the issuing corporation cannot vote shares held in its own name (5 Fletcher’s Cyclopedia Corporations [Perm, ed.], §§ 2034, 2041, pp. 177, 197; Fletcher Cyc Corp., 1970 Cum. Supp., § 2041, pp. 11-12; First Mtge. Bond Homestead Assn. v. Baker, 157 Md. 309, 315; Cleveland Trust Co. v. Eaton, 11 Ohio Misc. 151, 160; Aranow & Einhorn, Proxy Contests For Corporate Control [2d ed. 1968], supra, p. 398). Nevertheless, the fact that Host could not vote the pledged shares held in its own name should not bar Goldfield from voting by proxy. (See comment, The Corporate Fiduciary’s Power to Vote Its Own Stock, 68 Col. L. Rev. 116, 128.)
The security agreement does not provide for notice, it is silent on this issue. On the other hand, in a number of particulars the agreement meticulously requires notice and in others, with equal meticulousness, dispenses with notice. Since the security agreement was on a Union Bank form, any ambiguity should be construed to favor Goldfield (Rentways, Inc. v. O’Neill Milk & Cream Co., 308 N. Y. 342, 348; 10 N. Y. Jur., Contracts, § 223). The record transfer of title would obviously involve important consequences to the debtor. The ambiguity created by silence *273 on this critical issue may be resolved, arguably, to require the bank, and, therefore, its successor, Host, to give notice of such transfer.
Host argues in avoidance that Goldfield lost all rights when Host declared a default on the underlying note. However, default, if there was one, gave Host only the right to give notice and sell the pledged security or to bring a suit to foreclose the pledge and obtain a judicial sale (Markham v. Jaudon, 41 N. Y. 235, 243; First Trust & Deposit Co. v. Potter, 155 Misc. 106, 110; 53 N. Y. Jur., Secured Transactions, § 80, p. 337). Hence, neither Goldfield’s default nor Host’s notice of default had any determinative effect for voting purposes on Goldfield’s beneficial ownership of the pledged shares.
Concluding that Goldfield was wronged, it is significant whether it ever intended or essayed to be a factor in the election. Although Goldfield now claims that it did, the evidence, as noted earlier on the issue of notice of the meeting, is to the contrary. Up to the day of the election Goldfield urges that it believed it was the owner of record and entitled to vote, its 437,700 shares. Despite this fact, Goldfield neither solicited proxies, nor made any attempt to communicate with other shareholders. At no point did Goldfield propose an alternative slate of directors. The Goldfield resolution authorizing its president to vote its shares directs him to vote against management nominees for directorships but offered no alternative. To reiterate, while Goldfield was inactive, management acquired proxies, assuring for itself 60% of the vote by meeting time. There being no possibility -of a different result, whatever wrong was done to Goldfield as an individual shareholder does not justify holding a new election, with all the practical problems entailed.
Accordingly, the order of the Appellate Division should be affirmed, without costs.
Chief Judge Fuld and Judges Burke, Scileppi, Bergan, Jasen and Gibson concur.
Order affirmed.